FILED
2022 Sep-29  PM 01:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| **LINDA DARLENE HARRISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 6:21-cv-205-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Linda Darlene Harrison brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.      Introduction

On August 7, 2019, Ms. Harrison protectively filed an application for benefits under Title II of the Act, alleging disability as of September 26, 2018. R. 11, 98–117. Ms. Harrison alleges disability due to bursitis in her hips, tendonitis in her thighs, narcolepsy, hypertension, chronic myofascial pain disorder, and depression.

1

R. 99. She has at least a high school education and has past relevant work experience as a teacher. R. 20.

The Social Security Administration ("SSA") initially denied Ms. Harrison's application on October 18, 2019, and again denied it upon reconsideration on February 18, 2020. R. 11, 117–18, 133, 135. On February 18, 2018, Ms. Harrison filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 11, 149–50. That request was granted. R. 151–53, 166–70. Ms. Harrison received a telephone hearing before ALJ Cynthia W. Brown on August 24, 2020. R. 11, 51–68. On September 2, 2020, ALJ Brown issued a decision, finding that Ms. Harrison was not disabled from September 26, 2018 through the date of her decision. R. 8–22. Ms. Harrison was fifty-four years old at the time of the ALJ decision. R. 20, 22.

Ms. Harrison appealed to the Appeals Council, which denied her request for review on December 14, 2020. R. 1–4, 196–98. After the Appeals Council denied Ms. Harrison's request for review, R. 1–4, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On February 9, 2021, Ms. Harrison sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.  The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id. Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of

performing past relevant work, then the claimant is deemed not disabled. *Id*. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Harrison would meet the insured status requirements of the Act through December 31, 2020. R. 13. Next, the ALJ found that Ms. Harrison had not engaged in substantial gainful activity since September 26, 2018, the alleged disability onset date. R. 13. The ALJ decided that Ms. Harrison had the following severe impairments: osteoarthritis and narcolepsy. R. 13. The ALJ found that Ms. Harrison's depression, hypertension, chronic kidney disease, and gastroesophageal reflux disease were "non-severe" impairments because "these impairments constitute, at most, only slight abnormalities that cannot reasonably be expected to produce more than minimal, if any, work-related limitations." R. 14. The ALJ found that Ms. Harrison's fibromyalgia "is not a medically determinable

impairment" because it "cannot be established by medical signs and/or laboratory findings." R. 16. Overall, the ALJ determined that Ms. Harrison did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 16.

The ALJ found that Ms. Harrison's "statements concerning the intensity, persistence[,] and limiting effects of these impairments are not consistent with the objective medical evidence." R. 18. The ALJ found that Ms. Harrison had the "residual functional capacity to perform a range of light work" with certain limitations. R. 17. The ALJ determined that Ms. Harrison may frequently balance, but that she may occasionally stop, kneel, crouch, and crawl. R. 17. While the ALJ found that Ms. Harrison may climb ramps and stairs, she may never climb ladders, ropes, or scaffolds. R. 17. Further, the ALJ determined that Ms. Harrison must avoid concentrated exposure to cold, heat, vibration, fumes, odors, and other pulmonary irritants and any exposure to hazards. R. 17. Finally, the ALJ determined that Ms. Harrison would need a sit-stand option, and she would remain on task. R. 17.

According to the ALJ, Ms. Harrison is "unable to perform any past relevant work," she is "an individual closely approaching advanced age," and she has "at least a high school education," as those terms are defined by the regulations. R. 20. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly

supports a finding of 'not disabled,' whether or not the claimant has transferable job skills." R. 20. Because Ms. Harrison's "ability to perform all or substantially all of the requirements of this level of work" was impeded by additional limitations, the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Ms. Harrison would be capable of performing. R. 21. That expert testified that there are indeed a significant number of such jobs in the national economy, such as a cashier, marker, and office helper. R. 21.

Based on these findings, the ALJ concluded that Ms. Harrison did not have a disability as defined in the Act, from September 26, 2018 through the date of the decision. R. 12, 21–22. Ms. Harrison now challenges that decision.

## III. Factual Record

The medical records in the record span many years and cover various complaints. However, Ms. Harrison alleged she became disabled on September 26, 2018. R. 11. Additionally, Ms. Harrison limits her arguments to her narcolepsy and physical pain in her hips and legs, so the medical records concerning only those impairments are discussed here.

### A. Narcolepsy

Ms. Harrison presented to Dr. Jan Westerman at Pulmonary & Sleep Associates of Jasper for a new sleep evaluation on April 11, 2006. R. 346. Ms. Harrison was scheduled for a Polysomnogram and Mean Sleep Latency Test. R. 347.

Ms. Harrison completed the Polysomnography Study on April 27, 2006. R. 387. Ms. Harrison completed the Mean Sleep Latency Test on April 28, 2006. R. 389. Ms. Harrison returned to Dr. Westerman on May 1, 2006, after the completion of the sleep study. R. 349. She was diagnosed with "narcolepsy without cataplexy." R. 349. Ms. Harrison was to undergo nap therapy and sleep hygiene and follow up in one month. R. 350.

Ms. Harrison returned to Dr. Westerman on April 12, 2007. R. 351. At that time she "ha[d] a negative Narcolepsy profile. She ha[d] pathologic hypersomnolence." R. 351. However, Dr. Westerman noted that he "believe[d] that she does have narcolepsy." R. 352. Ms. Harrison reported that the Provigil was not as effective, and her dose was increased. R. 351. Ms. Harrison returned on April 10, 2008 to check her medications. R. 392. She was instructed not to drive and to follow up in one month. R. 394. Ms. Harrison returned on May 27, 2008 for a refill of medications. R. 397. At the time she was complaining of headaches. R. 397. She was continued on Provigil with the addition of Ritalin and advised to return to the clinic in six months. R. 399–400.

Ms. Harrison returned to Dr. Westerman on December 1, 2008. R. 403. Ms. Harrison had not yet increased her Ritalin dose to twice a day, but was again encouraged to do this. R. 406. She was also encouraged to engage in therapy, increase her physical activity, and return in one month. R. 406. Ms. Harrison

returned on September 11, 2009. R. 408. She was still being treated with Provigil and Ritalin, though she was not using nap therapy. R. 408. Ms. Harrison reported experiencing "occasional headaches with Ritalin treatment." R. 408. Ms. Harrison was taken off Provigil and prescribed Nuvigil. R. 410. Ms. Harrison returned to Pulmonary & Sleep Associates of Jasper on April 1, 2010 and was seen by Dr. John Jessup. R. 417. Ms. Harrison reported that the Nuvigil "was not significantly better than the Provigil," and that the Ritalin, which she was taking twice in the afternoon, was "helpful but . . . tend[s] to give her a headache." R. 417. She was advised to get more sleep at night, and she was prescribed Provigil to take in the afternoon. R. 419.

Ms. Harrison returned to Dr. Westerman on September 15, 2010. R. 421. Her hypersomnia was "well controlled by current therapy," which would be continued. R. 423. However, her medication dose was higher than recommended and would be considered by an endocrinologist in light of her hypertension. R. 423.

In 2015, Ms. Harrison reported to Dr. David Spalding that she "was on Provigil for narcolepsy but was having side effects and is now off of that." R. 468.

The assessment from Ms. Harrison's December 7, 2016 visit to Premier Health Center notes that she would be referred for narcolepsy. R. 522.

Dr. Bell referred Ms. Harrison to Dr. Alan Thomas of Pulmonary Associates of the Southeast for a sleep evaluation. R. 920. Dr. Thomas noted her narcolepsy diagnosis, and the history of present illness noted her severe hypersomnia. R. 920.

The assessment from Ms. Harrison's December 1, 2017 visit to Premier Health Center notes "Narcolepsy – sleep study." R. 686. Ms. Harrison underwent a sleep study under the supervision of Dr. Westerman on December 12, 2017. R. 668.

Ms. Harrison presented to Nurse Practitioner Aleisha Dunagan at Pulmonary and Sleep Associates of Jasper on December 12, 2017. The History of Present Illness states in part: "Patient was seen in this practice in the past and was diagnosed with narcolepsy. Was treated with Provigil but stopped this a couple of years ago. She did not feel that Provigil was helping and she was taking 600 mg per day." R. 664. Ms. Harrison reported that she tried Nuvigil, Adderall, and Ritalin, but "was unable to take these," and "Provigil was also ineffective." R. 664. As a follow-up to her sleep study, Ms. Harrison reported that she was "not interested in starting back on [Provigil because] she felt this changed her personality completely." R. 670. Ms. Harrison was considering starting Xyrem. R. 670.

Ms. Harrison returned to Dr. Westerman on April 5, 2018 for a narcolepsy follow-up and fatigue. R. 717. Ms. Harrison reported that she was "very sleepy during the day and having [a] hard time staying awake." R. 717. She stated that she had researched Xyrem and did "not want to start this," that Adderall was "not effective," and that "[P]rovigil worked but caused her personality changes." R. 717. Dr. Westerman decided to treat Ms. Harrison with Desoxyn, and if it proved to be

ineffective he noted that they may try Vyvanse. R. 719. Ms. Harrison was to return in one month. R. 719.

On May 20, 2019, Ms. Harrison returned to Premier Health Center and the medical records indicate she was taking Provigil for narcolepsy. R. 934. On August 15, 2019, Ms. Harrison reported to Dr. Bell that she had not been to a sleep specialist since her last visit to Dr. Bell and reported that she did "not want to try Xyzal for narcolepsy." R. 888. Ms. Harrison presented to Premier Health Center on May 5, 2020, and the records indicate she was not taking medications for narcolepsy. R. 1241.

### B. Physical Pain

Ms. Harrison was treated by the Jasper Podiatry Center in 2013 for heel pain. R. 428–30. She was also treated in 2014 for pain in the bottoms of her feet. R. 431. She was referred to and treated by Dr. William Krauss in 2015 for bilateral peripheral neuropathy. R. 435. In January 2015, Ms. Harrison reported that her bilateral foot pain "has created restriction of physical activities and has disrupted [her] sleep." R. 437. She reported that it had been present for ten months, and she had tried Neurontin without improvement. R. 438. She received injections in her plantar fascia in November 2015. R. 436.

Ms. Harrison presented to Dr. David Spalding on September 22, 2015 complaining of all over pain. R. 468. She reported that she "had to retire because of

her foot and leg pain and disability." R. 468. She noted that Mobic and Relafen didn't benefit her and Klonopin resulted in side effects. R. 468. She stated that her pain wakes her up on a regular basis. R. 468. Dr. Spalding's impression was that Ms. Harrison did "have very significant bilateral trochanteric bursitis and iliotibial band tendinitis," which he believed was "creating a significant amount of her leg and foot pain and dysesthesias and dysfunction." R. 470. Dr. Spalding believed that it was "exacerbating her problems with narcolepsy," and that her "nonrestorative sleep" is "caus[ing] some additional superimposed myofascial pain." R. 470. Ms. Harrison was treated with injections. R. 470.

Ms. Harrison returned to Dr. Spalding on October 28, 2015. R. 480. Dr. Spalding noted that Ms. Harrison "still has significant active trochanteric bursitis with a milder iliotibial band tendinitis and no evidence for rheumatoid arthritis so we will have to retreat the trochanteric bursitis and be rigorous in her use of cold and heat and protective measures." R. 482. Ms. Harrison was treated with injections to her trochanteric bursa. R. 482. Ms. Harrison returned to Dr. Spalding on December 10, 2015. Ms. Harrison reported that she had a slight improvement overall, but significant trauma to her left hip after a fall. R. 484. She also reported that "[s]he wakes at night with pain." R. 484. She was treated with injections to her left trochanteric bursa and her right and left iliotibial band tendon/fascia. R. 485. Dr. Spalding wrote that Ms. Harrison "is making some progress especially on the right

side but this fall has interrupted her progress on the left side so she has persistence of left trochanteric bursitis but resolution of trochanteric bursitis on the right and with persistence of bilateral iliotibial band tendinitis which we have not been able to treat but can start treating now. In 2 weeks we'll start a careful stretching regimen and then start introducing graded exercise program in a month and check her progress in 2 months and hopefully she'll be in a return to work at that point. She'll continue her mobic." R. 485.

Ms. Harrison presented to Dr. Spalding on March 7, 2016 complaining of leg and feet pain and bilateral hip pain. R. 465. She was diagnosed with bilateral leg and foot pain, bilateral leg weakness, and chronic fatigue and received an injection in her left trochanteric bursa. R. 467. Ms. Harrison underwent hip X-Rays that showed "Alignment is anatomic without fracture or acute skeletal abnormality. Mild bilateral degenerative osteoarthrosis of the hips noted." R. 457. Ms. Harrison presented to Dr. Spalding on March 14, 2016 complaining of bilateral hip and foot pain. R. 463. She was diagnosed with trochanteric bursitis of both hips and was treated with an injection in her right trochanteric bursa. R. 464.

Ms. Harrison returned to Dr. Spalding on September 20, 2016. R. 503. At this visit, Dr. Spalding diagnosed her with chronic myofascial pain. R. 506. He noted that there is "no clinical evidence on exam for rheumatoid arthritis or any other type of systemic inflammatory arthritis." R. 506. He also stated that Ms. Harrison has

"complete control of her trochanteric bursitis," and "superimposed chronic myofascial pain that did not get much improvement after controlling her trochanteric bursitis." R. 506. He recommended that her primary care physician or pain management specialist "work on control of the myofascial pain," and noted that Ms. Harrison would try Flexeril. R. 506.

For primary care, Ms. Harrison was treated by Dr. Scott Dixon at Premier Health Center. *See* R. 514. Ms. Harrison returned to Premier Health Center on October 22, 2015 after falling on a bathtub and hurting her right ribs. R. 516. Ms. Harrison returned to Premier Health Center on July 1, 2016 for leg pain and hypertension. R. 515. Ms. Harrison returned to Premier Health Center on August 24, 2016 complaining of bodyaches, feet hurting all the time, and fatigue. R. 514. Ms. Harrison returned to Premier Health Center on December 7, 2016. R. 522.

Ms. Harrison returned to Premier Health Center on April 27, 2017 to discuss her disability paperwork. R. 517. She was assessed with chronic myofascial pain. R. 517. She returned for a six-month appointment on June 6, 2017. R. 520. Dr. Scott Dixon of Premier Health Center wrote a letter dated June 12, 2017 that stated: "Mrs. Harrison is disabled due to her diagnosis of chronic myofascial pain." R. 519. Dr. Dixon referred Ms. Harrison for an MRI of the lumbar spine without contrast for her bilateral back and hip pain. R. 558. The July 18, 2017 MRI revealed "Facet arthropathy at the lower 2 levels. No canal or foraminal stenosis. Tiny focal disc

protrusion in the right neural foramen at L4-5. No encroachment of the nerve rootlet." R. 558.

Dr. Dixon also referred Ms. Harrison to Dr. Charles Bell at Grandview Rheumatology. R. 561. Ms. Harrison initially saw Dr. Bell on October 12, 2017. R. 565. She reported a history of narcolepsy and daytime sleepiness and taking herself off of Provigil "due to change in attitude." R. 566. Dr. Bell diagnosed her with narcolepsy, myofascial pain, and plantar fasciitis, and referred her to physical therapy. R. 567–68.

She saw Dr. Bell on November 21, 2017. Ms. Harrison reported continued "hip discomfort" and "soft tissue pain." R. 562. She also reported that she had "been to PT; she is doing exercises. Pool therapy seems to be helpful." R. 563. Ms. Harrison reported being "unable to sleep due to pain in hips." R. 563.

Dr. Dixon referred Ms. Harrison to Pulmonary & Sleep Associates of Jasper in December 2017. R. 664. Ms. Harrison noted that her foot pain was "thought to be worsened because she is not getting restorative sleep (per rheumatologist)." R. 664. She also reported that her pain has progressively gotten worse. R. 664.

Ms. Harrison was seen by North Central Neurology Associates on January 3, 2018 for "progressive weakness." R. 677. Ms. Harrison was referred "for very typical fibromyalgia type pain," and "describe[d] severe pain to the point that her bed sheets cannot touch her feet." R. 677. She was started on "very low-dose

Cymbalta for fibromyalgia." R. 679. Ms. Harrison returned on March 14, 2018 to follow up. R. 705. She stated that "Cymbalta did nothing for her fibromyalgia" and she was "still having pain in hips and legs." R. 705. The C-reactive protein test was repeated, Ms. Harrison was given Trezix, and was advised to continue pool therapy. R. 711. Based upon the results of the C-reactive protein test, Ms. Harrison was to follow up with Dr. Bell. R. 712. Ms. Harrison returned on June 21, 2018 for a routine follow-up appointment. R. 761. Ms. Harrison stated that she was seeing the neurologist to follow up on headaches, fibromyalgia, weakness, and numbness and that her rheumatologist wanted "to more aggressively treat her pain." R. 761. The visit notes indicate that the "[s]everity of pain is substantial without meds, but doing very well with current medications." R. 761. Ms. Harrison reported currently taking Neurontin, Cymbalta, trezix, Vitamin D, and occasionally Vyvanse. R. 761. The plan was to refill Cymbalta and trezix and for Ms. Harrison to continue on Vitamin D. R. 764. The neurologist noted that Ms. Harrison "may need additional scans and possible pain clinic referral." R. 764.

Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on April 13, 2018 with bilateral hip, shoulder, and leg pain, especially leg pain at night. R. 903, 905. Although she was not doing PT, she was going to the gym three days a week and walking on the treadmill, using mechanical massage, and a tanning bed. R. 905. Dr. Bell advised that she continue exercising and stretching, try Cymbalta and

Neurontin, and return in six weeks. R. 907. Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on May 25, 2018. R. 899. She rated her pain at a five and stated that "[b]oth legs are aching." R. 899. She reported that the hip stretches were not helpful for managing symptoms, she is on "a mild pain medication . . . which has been only of modest benefit," and she is walking some. R. 901. Dr. Bell noted that "the current findings were most suggestive of a rheumatic condition related to the underlying sleep disorder." R. 902. He increased her Klonopin, encouraged exercises and stretching, and advised her to return in six weeks. R. 903. Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on July 13, 2018. R. 895. At that visit, she complained that her hips were "really hurting," "the injections only last a little while," and that she "tried PT also for hips" but did not get much help. R. 895. She reported that she weaned herself off Klonopin because of memory problems. R. 895. She requested "stronger pain medications for back and hip pain." R. 897. Dr. Bell started her on Norco, encouraged her to continue exercises and stretching, and to return in three months. R. 899. Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on April 2, 2019. R. 890. She reported "more knee pain, foot and hip pain." R. 892. She also reported walking at the gym up to three miles on some occasions and stretching. R. 892. Her Neurontin dose was 900 mg, but she was off Cymbalta. R. 892, 894. She also reported that "PT is too expensive," and she was "[u]sing a tanning bed." R. 892. She was encouraged to return in three months,

16

continue Norco, and continue exercises and stretching. R. 894. Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on August 15, 2019, and stated she was experiencing foot and hip pain, joint swelling in her ankles, and morning stiffness. R. 887. Dr. Bell increased her Norco and prescribed Prednisone. R. 889. She was also advised to stop taking Ibuprofen for pain control due to chronic kidney disease. R. 890. Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on November 21, 2019. R. 968. She was "unable to tolerate steroids" and had "not be[en] going for exercise." R. 972. Dr. Bell increased her Norco, advised her to avoid all NSAIDs, and advised her to return in four months. R. 972.

Ms. Harrison reported to Dr. Bell at Grandview Rheumatology on May 11, 2020 for a three-month check-up and medication refills. R. 1053. She reported having more pain going up and down stairs and requested pain medications. R. 1057. Dr. Bell increased her Norco, advised her to avoid all NSAIDs, encouraged exercise and conditioning, and advised her to return in three months. R. 1059.

## IV.   Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

**V.    Discussion**

Ms. Harrison alleges that the ALJ's decision should be reversed and remanded because: (1) the Appeals Council failed to properly consider new evidence; (2) the ALJ failed to properly consider the medical evidence of record; (3) the ALJ failed to consider Dr. Dixon's opinion; and (4) the ALJ improperly evaluated Ms. Harrison's credibility. Doc. 13 at 14, 18.

## A. New Evidence

A claimant may present new evidence at each stage of the administrative process, including to the Appeals Council. *Ingram v. Comm'r*, 496 F.3d 1253, 1261 (11th Cir. 2007). The Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5).

Evidence is not new when it is cumulative of evidence already submitted to the ALJ. *Clough v. Comm'r*, 813 F. App'x 436, 443 (11th Cir. 2020). Evidence is material when it is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987). New evidence is chronologically relevant if "it relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(a)(5). Medical opinions based on treatment occurring after the date of the ALJ's decision

may still be chronologically relevant if they relate back to a time on or before the ALJ's decision. *Washington v. Comm'r*, 806 F.3d 1317, 1322 (11th Cir. 2015).

The Appeals Council is not required to provide a detailed rationale for why each piece of new evidence fails to change the ALJ's conclusion. *Mitchell v. Comm'r*, 771 F.3d 780, 784 (11th Cir. 2014). The court reviews *de novo* whether supplemental evidence is new, material, and chronologically relevant. *Washington*, 806 F.3d at 1321.

Ms. Harrison submitted evidence to the Appeals Council from a September 21, 2020 visit to Pulmonary and Sleep Associates of Jasper. R. 1308–11. Ms. Harrison presented to Nurse Practitioner Dunagan to "follow up for narcole[ps]y." R. 1308. The History of Present Illness states: "She does have narcolepsy. She is having trouble sleeping at night. She reports once she is falling asleep it is hard to wake her up. She feels she could sleep all through the day. Patient has been tried on Adderall but reports this caused massive headaches. Patient has also tried Provigil and Nuvigil. She was on high doses of Provigil and felt she was addicted to it." R. 1308. Ms. Harrison also reported that she "normally goes to bed from 10pm – 10am." R. 1308. Ms. Harrison stated it took "hours to fall asleep," and she "experience[s] nocturia so she wakes up several times per night." R. 1308. The History of Present Illness also states that Ms. Harrison has "extreme daytime sleepiness, ESS=14," and she "feels like she is only able to stay awake for 2 hours at a time[,] and then she is

extremely sleepy during the day[,] but at night, she has trouble falling to sleep and staying asleep." R. 1308. Ms. Harrison's past medical history included "Narcolepsy without cataplexy." R. 1308. It was noted that she would try the medication Wakix, but that although Nurse Dunagan thought Xyrem would be a good medication "because it would help induce a deeper night time sleep," Ms. Harrison had researched the drug and did not want to try it. R. 1308.

Ms. Harrison complained of body aches and fatigue, but denied muscle weakness, muscle swelling, joint weakness, joint stiffness, and joint inflammation. R. 1309. The physical exam revealed no joint or limb tenderness, and Ms. Harrison had normal gait, the ability to stand without difficulty, normal muscle tone, and normal strength. R. 1310.

In addition to narcolepsy, Ms. Harrison was also diagnosed with sleep disturbance, which was described as "trouble sleeping at night but extreme sleepiness during the day." R. 1311.

The Appeals Council "considered the reasons" Ms. Harrison "disagree[d] with the [ALJ] decision." R. 1. The Appeals Council "found that the reasons do not provide a basis for changing the [ALJ's] decision." R. 1. The Appeals Council's determination specifically referenced the five pages of "Additional Evidence" submitted by Ms. Harrison. R. 2. The Appeals Council concluded that the "additional evidence does not relate to the period at issue." R. 2.

The Appeals Council did not err in finding that the "additional evidence does not relate to the period at issue." R. 2. With respect to the additional evidence, Ms. Harrison presented to Pulmonary and Sleep Associates of Jasper where she had a treatment history. Medical providers from that clinic treated her narcolepsy from 2006 to 2010, in 2017, and in April 2018. Additionally, the additional evidence states that Ms. Harrison presented to "follow up for narcole[ps]y." R. 1308. However, there is no indication that the information in the additional evidence related to the period at issue – namely, the alleged onset date of September 26, 2018 through the date of the ALJ's decision, September 2, 2020. Nor could it be argued that the past medical records at Pulmonary and Sleep Associates of Jasper related to that period because Ms. Harrison was not treated as a patient after her alleged onset date until after the date of the ALJ's decision. The question before the court is whether Ms. Harrison was "entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision." *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999).

In any event, even if the additional evidence were chronologically relevant, it does not change the result. First, the additional evidence is generally cumulative of evidence already submitted to the ALJ because it reiterated Ms. Harrison's previously identified narcolepsy diagnosis, as well as nighttime sleep issues and daytime sleepiness. It also referenced her medication history and her hesitancy at

trying Xyrem, both of which were discussed elsewhere in the medical record. Second, the additional evidence is not material because there is not a reasonable probability that it would change the administrative result because it reiterated what was established in Ms. Harrison's medical history and hearing testimony. Even without the additional evidence, the ALJ identified Ms. Harrison's narcolepsy as a severe impairment in her disability determination.

### B. Totality of Medical Evidence

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.* Erroneous statements of fact in the ALJ's decision are harmless when they do "not affect the ALJ's ultimate determination." *Id.* at 775-76; *see Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding ALJ's errors were harmless when substantial evidence supported ALJ's determination).

Ms. Harrison's argument that the "ALJ failed to properly consider the totality of the medical evidence" is two-fold. Doc. 13 at 18. First, she alleges that "the ALJ stated [she] was not treated for her narcolepsy, but the ALJ's conclusion is simply

untrue." *Id.* Second, she alleges that the ALJ "cherry-picked portions of the record" as it relates to physical pain and symptoms. *Id.* at 20.

The Commissioner argues that "the treatment records [Ms. Harrison] cites do not at all contradict the ALJ's statement that [her] narcolepsy was untreated in September 2020." Doc. 15 at 12. Additionally, the Commissioner argues that the ALJ "weigh[ed] the evidence" and "carefully considered all of the medical evidence," including "positive findings on exam." *Id.* at 14 (cleaned up).

When discussing Ms. Harrison's narcolepsy and physical pain, the ALJ initially identified both narcolepsy and osteoarthritis as severe impairments, meaning they "constitute more than slight abnormalities and have more than a minimal effect on the claimant's ability to perform basic activities for a continuous period of 12 months." R. 13. The ALJ went on to determine Ms. Harrison's residual functional capacity. R. 17–20. In performing this administrative function, the ALJ considered Ms. Harrison's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." R. 17.

The ALJ described Ms. Harrison's testimony as:

> The claimant alleges an inability to work due to narcolepsy and chronic myofascial pain. She testified that she has had narcolepsy for 15 years and it has worsened. She alleges excruciating pain. She alleges she cannot sleep well due to pain, and when she does it is miserable sleep. She alleges that if she must drive, she drinks a Red Bull to stay awake.

R. 18. The ALJ acknowledged that "the evidence shows a history of treatment for these impairments." R. 18. With respect to Ms. Harrison's narcolepsy, the ALJ also stated:

> In fact, the claimant was once in treatment for narcolepsy but is not currently, so her underlying sleep disorder goes untreated.
>
> A review of the claimant's treatment records from her various providers, including Dr. Bell, her rheumatologist, shows that she has not been back to her sleep specialist. Dr. Bell offered her Xysal for narcolepsy, but she turned it down because she was afraid of going into a deep sleep at night when her husband was away, even though at the hearing she reported she was always tired because she did not sleep well. When offered medication, she turned it down. She stopped taking Klonopin on her own, without discussing it with her doctor, because her family felt she was losing her memory.

R. 18.

The ALJ specifically acknowledged Ms. Harrison's testimony regarding a fifteen-year struggle with narcolepsy that had gotten worse. R. 18. The record is void of treatment records from her sleep specialist from the alleged onset date through the date of decision related to Ms. Harrison's narcolepsy. *See supra* Section III.A. As correctly noted by Ms. Harrison, she did report her narcolepsy and related symptoms and medication struggles to both her primary care physician and Dr. Bell, her rheumatologist, during the relevant period. *See id.*; R. 888, 934, 1241. In her decision, the ALJ specifically discussed Ms. Harrison's visit to Dr. Bell as well as

Dr. Bell's opinion that Ms. Harrison's physical symptoms were related to her underlying sleep disorder. R 16, 18. Additionally, the ALJ acknowledged Ms. Harrison's reasons for not taking medication for narcolepsy. R. 18. The court discerns no error in the ALJ's treatment of the medical records related to narcolepsy. Instead, substantial evidence supports the ALJ's finding that while Ms. Harrison's narcolepsy was a severe impairment, her medical treatment records did not support that she had disabling limitations as a result of her narcolepsy or limitations in her residual functional capacity beyond those assessed.

When discussing Ms. Harrison's pain, the ALJ identified osteoarthritis as a severe impairment, R. 13, and evaluated her allegations of fibromyalgia and determined it was not a medically determinable impairment under the SSA's policy interpretation, R. 14–15. The ALJ acknowledged that she "considered [Ms. Harrison's] complaints of myofascial pain as a severe medically determinable impairment that restricts her ability to perform some of the demands of work." R. 16. The ALJ referenced Ms. Harrison's treatment by her rheumatologist, Dr. Bell, and his assessment that her "physical findings are most suggestive of a rheumatic condition related to the underlying sleep disorder." R. 16 (cleaned up). The ALJ also determined that Ms. Harrison's osteoarthritis did not meet a listing because she "is still able to ambulate effectively and perform fine and gross movements effectively." R. 16–17.

In formulating her residual functional capacity, the ALJ stated that:

> [Ms. Harrison] complained of foot, knee, and hip pain and [was] diagnosed with myofascial pain. She was initially in physical therapy (PT) and doing well with exercise and pool therapy, but she eventually stopped. She reported she was no longer going to PT, but was going to the gym several times a week and walking on the treadmill, getting mechanical massages, and going to the tanning bed.
>
> In addition, [Ms. Harrison's] physical examinations show no significant abnormalities. She has had some tenderness in her fingers, elbows, shoulders, hips, and spine due to myofascial pain, but she has normal gait and station, ambulates normally, and her sensation is grossly intact. Her gynecologist even noted normal gait and station. She was taking Cymbalta, but she stopped. She was prescribed Norco and Prednisone. She had a magnetic resonance image (MRI) of her left hip and it was negative. An electromyogram (EMG) and nerve conduction studies (NCS) of her legs were negative. Dr. Bell consistently noted at various visits that [her] physical findings are "most suggestive of a rheumatic condition related to the underlying sleep disorder".
>
> [Ms. Harrison] reported a pain level of 6 on November 21, 2019, so her Norco dosage was increased, but despite the pain, she is able to perform her activities of daily living (ADLs) with little difficulty. During a recent telephone appointment, [Ms. Harrison] reported increased pain because she was going up and down the steps at her daughter's home in South Carolina, where she was currently staying.

R. 18–19 (internal citations omitted). After discussing this medical evidence, the ALJ determined that Ms. Harrison's "impairments would reasonably limit her to light work as heavy lifting and carrying and prolonged standing and walking may

exacerbate her pain." R. 19–20. The ALJ also imposed other limitations on Ms. Harrison's residual functional capacity in an effort to not exacerbate pain and as a safety precaution to account for pain such as: limiting her ability to climb, limiting her ability to perform certain postural maneuvers, limiting exposure to hazards, limiting her exposure to environments that are known pain triggers, and giving her a sit/stand option. R. 20. In light of the residual functional capacity, the ALJ determined that Ms. Harrison was unable to perform her past relevant work as a teacher. R. 20.

The ALJ's decision demonstrates that she considered the entire record and did not cherry-pick facts. She assessed medical records from various sources and cited them throughout her findings. R. 15–20. The ALJ specifically cited positive findings, Ms. Harrison's complaints of pain to her doctors, and her use of pain medication to manage her symptoms. And, the ALJ took care to incorporate Ms. Harrison's complaints of pain into her residual functional capacity, as well as imposing additional limitations to account for and not exacerbate that pain. The ALJ's findings are supported by substantial evidence.

### C. Dr. Scott Dixon's Opinion

SSA regulations provide that "[s]tatements on issues reserved to the Commissioner[]" are "neither valuable nor persuasive to the issue of whether [a claimant is] disabled" and the SSA "will not provide any analysis about how we

considered such evidence in [the] determination or decision. 20 C.F.R. § 404.1520b(c)(3). Statements on issues reserved to the Commissioner include: (i) Statements that a claimant is or is not disabled, blind, able to work, or able to perform regular or continuing work; (ii) Statements about whether or not a claimant has a severe impairment(s); (iii) Statements about whether or not a claimant's impairment(s) meets the duration requirement of the SSA; (iv) Statements about whether or not a claimant's impairment(s) meets or medically equals any listing; (v) Statements about what a claimant's residual functional capacity is using the agency's programmatic terms about the functional exertional levels instead of descriptions about the claimant's functional abilities and limitations; (vi) Statements about whether or not a claimant's residual functional capacity prevents her from doing past relevant work; (vii) Statements that a claimant does or does not meet the requirements of medical-vocational rule; and (viii) Statements about whether or not a claimant's disability continues or ends when the agency conducts a continuing disability review. *Id.*

In contrast, under the regulations, "[a] medical opinion is a statement from a medical source about what [a claimant] can still do despite [her] impairment(s) and whether [she] has one or more impairment-related limitations or restrictions" in listed abilities, including the "ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other

physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching)." 20 C.F.R. § 404.1513(a)(2)(i).

At issue is a one-page "Attending Physicians Statement" submitted to American Fidelity. R. 926. Dr. Scott Dixon, a primary care physician at Premier Health Center, is listed as the Attending Physician. R. 926. However, the form was completed by Nurse Practitioner Amanda Barton, and signed by Dr. Dixon. R. 926. The Attending Physicians Statement lists narcolepsy and chronic myofascial pain as Ms. Harrison's diagnoses. R. 926. Under prognosis, the box "yes" is checked next to these questions: "Is patient now Disabled? For Regular occupation?" and "For any Occupation?" R. 926. Additionally selected is a Class 5 level of impairments, "Severe limitation of functional capacity; [i]ncapable of minimum sedentary activity *(75-100%)." R. 926. Finally, in the functional limitations/restrictions section, Nurse Barton wrote: "Patient is unable to stand to teach" and "Chronic Myofascial Pain." R. 926.

With respect to this evidence, the ALJ stated: "Dr. Dixon opined that the claimant is unable to teach due to chronic myofascial pain, but this is an issue reserved to the Commissioner based on all the evidence." R. 19 (cleaned up).

Ms. Harrison argues that "[t]he ALJ erroneously afforded no weight to the opinions of Dr. Scott Dixon" and incorrectly concluded that "Dr. Dixon's opinion is an issue reserved to the Commissioner." Doc. 13 at 21. Ms. Harrison also alleges

that the "ALJ mischaracterize[d] Dr. Dixon's opinions." *Id.* The Commissioner argues that none of the statements "constituted a medical opinion within the meaning of the regulations" and "were all statements on issues reserved to the Commissioner." Doc. 15 at 17.

The Attending Physicians Statement contained statements on issues reserved for the Commissioner, and the ALJ properly refrained from providing analysis on how those statements impacted her decision. First, the questions under the Prognosis section expressly asked Nurse Barton and Dr. Dixon whether Ms. Harrison was disabled. Second, the selection of a level of impairments in the Impairments section specified a functional exertional level under the regulations – sedentary – and classified Ms. Harrison's impairments as severe. Third, Nurse Barton attested that Ms. Harrison was unable to perform her past work. The ALJ did not err in her treatment of these statements. Importantly, the ALJ agreed with Nurse Barton and Dr. Dixon on Ms. Harrison's standing limitations. In fact, the ALJ specifically found that Ms. Harrison could not perform her past relevant work, limited Ms. Harrison to light work with additional restrictions, and imposed a sit/stand option.

### D. Credibility Determination

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 416.929(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a

31

disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 416.929(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 416.929(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect his capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 416.929(c)(3), (4); SSR 16-3p at *4, *7–*8. "In determining whether a

claimant's impairments limit [his] ability to work, the ALJ considers the claimant's subjective symptoms, which includes the effectiveness and side effects of any medications taken for those symptoms." *Walker v. Comm'r*, 404 F. App'x 362, 366 (11th Cir. 2010). To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *See Dyer*, 395 F.3d at 1210.

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A credibility determination is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D.F.L. 1996) (holding that the ALJ's failure to articulate

adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

After explaining the pain standard, the ALJ considered Ms. Harrison's testimony about her symptoms to make her credibility determination. R. 17–20. The ALJ described that testimony as follows:

> The claimant alleges an inability to work due to narcolepsy and chronic myofascial pain. She testified that she has had narcolepsy for 15 years and it has worsened. She alleges excruciating pain. She alleges she cannot sleep well due to pain, and when she does it is miserable sleep. She alleges that if she must drive, she drinks a Red Bull to stay awake.

R. 18. The ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." R. 17. The ALJ acknowledged that the "evidence shows a history of treatment for" narcolepsy and chronic myofascial pain. R. 18. The ALJ stated:

> [Ms. Harrison's] statements concerning the intensity, persistence[,] and limiting effects of these impairments are not consistent with the objective medical evidence. [Ms. Harrison] alleges debilitating symptomatology and limitations associated with her alleged impairments, yet the evidence as a whole fails to confirm a disabling level of functional limitations caused by any physical or mental impairment. The description of the symptoms and limitations, which [Ms. Harrison] has provided throughout

> the record, has generally been inconsistent and unpersuasive. While it is reasonable [Ms. Harrison] may experience some symptoms that would cause some exertional and non-exertional limitations, the objective medical evidence does not support a complete inability to work.

R. 18.

The ALJ considered the objective medical evidence during the relevant period from Ms. Harrison's rheumatologist, primary care doctor, and gynecologist. R. 18–19. The ALJ discussed that Ms. Harrison "was doing well with exercise and pool therapy," had been to physical therapy, and was going to the gym and walking on the treadmill. R. 18. While Ms. Harrison's examinations showed tenderness and her pain was treated with pain medicine, she had normal gait and station and ambulated normally. R. 18. After considering this medical evidence along with the function reports and hearing testimony, the ALJ concluded that

> [Ms. Harrison's] impairments would reasonably limit her to light work as heavy lifting and carrying and prolonged standing and walking may exacerbate her pain. For the same reason, she is limited in her ability to climb and to perform certain postural maneuvers that could exacerbate pain. Due to possible slower reaction time due to pain, as a safety precaution, [Ms. Harrison] is precluded from climbing ladders, ropes, or scaffolds and from any exposure to hazards. She is precluded from climbing ladders, ropes, or scaffolds also because these pose a fall risk that could exacerbate pain and cause new or further injury. She should avoid concentrated exposure to extreme cold, heat, and vibration as these environments are known pain triggers. She should avoid fumes, odors, and other pulmonary irritants due to the combination of her impairments. Due to OA, she would need

> the option to sit or stand in performance of her job duties but
> would remain on task.

R. 19–20.

Ms. Harrison again argues that the ALJ "cherry-pick[ed] facts that support her assessment" and "failed to adequately evaluate her credibility." Doc. 13 at 23. She also argues that "[t]he ALJ fails to recognize that M[s]. Harrison received regular treatment for severe and chronic pain and the medical evidence corroborates the existence of pain." *Id.* at 25. Ms. Harrison also argues that the "ALJ insinuates [she] was non-compliant with physical therapy" and "discredits Ms. Harrison based on the function report." *Id.* at 26. The Commissioner argues that Ms. Harrison does not identify any evidence the ALJ ignored and disagrees with Ms. Harrison's interpretation of the ALJ's opinion. Doc. 15 at 21.

Substantial evidence supports the ALJ's finding under the pain standard. The ALJ specifically discussed Ms. Harrison's long-time treatment for her impairments, her positive exam findings, and her need for pain medication. In fact, she crafted her residual functional capacity with additional limitations taking Ms. Harrison's pain (and desire not to exacerbate it) into account.

In analyzing Ms. Harrison's testimony, the ALJ clearly discussed the objective medical evidence. The ALJ's decision indicates that she considered the medical evidence as a whole and did not broadly reject the evidence in the record. The ALJ mentioned that Ms. Harrison was no longer doing physical therapy in the

context of her explanation that Ms. Harrison's subjective complaints were inconsistent with the medical evidence in the record – namely, that Ms. Harrison had been doing well with various therapy and exercising at the gym by walking on the treadmill. With respect to Ms. Harrison's function report, the ALJ simply stated that she had considered it along with the other evidence in the record and pursuant to the applicable regulations in forming her residual functional capacity.

The ALJ was not "clearly wrong" to discredit Ms. Harrison's subjective complaints. *See Werner*, 421 F. App'x at 938–39. Additionally, Ms. Harrison has pointed to no evidence that would compel a different conclusion from that found by the ALJ. There is no evidence in the record to support Ms. Harrison's testimony that her narcolepsy and pain prevents light work with the restrictions identified by the ALJ. Accordingly, there is no error in the ALJ's consideration of Ms. Harrison's subjective complaints.

## VI.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 29th day of September, 2022.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE